Filed 2/28/23  In re A.J. CA4/2
(See concurring opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E079687 |
| Plaintiff and Respondent, | (Super.Ct.No. J292132) |
| v. | OPINION |
| J.C., ET AL, | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Conditionally reversed with directions.

Michelle D. Pena, by appointment of the Court of Appeal, for Defendant and Appellant, J.C.

Jamie A. Moran, by appointment of the Court of Appeal, for Defendant and Appellant, P.J.

Tom Bunton, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Respondent.

## I. INTRODUCTION

Defendant and appellant J.C. (Mother) is the mother, and defendant and appellant P.J. is the alleged father of A.J., a child born in April 2021. Mother and P.J. appeal from the August 30, 2022 orders terminating parental rights to A.J. and selecting adoption as A.J.'s permanent plan. (§ 366.26)[1] The parents claim the section 366.26 orders must be conditionally reversed and the matter remanded with directions to ensure that San Bernardino Children and Family Services (CFS) discharges its duty of initial inquiry and, if applicable, its duties to conduct a further inquiry and to give notice of the proceedings pursuant to the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) and related California law (§§ 224.2, 224.3).

The parents claim CFS did not discharge its initial duty of inquiry under state law (§ 224.2, subd. (b)) because it did not make meaningful efforts to locate and interview six maternal extended maternal family members—the maternal grandmother (the MGM)); a maternal cousin, Monica R.; and four maternal aunts, Lupé S., Teresa R., Sylvia C., and

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

Reyna C.—for information concerning A.J.'s possible status as an Indian child. The parents also claim the juvenile court and CFS erroneously failed to question P.J. concerning A.J.'s possible status as an Indian child when P.J. first appeared in the proceedings at the August 30, 2022 section 366.26 hearing, even though P.J. never elevated his status to a presumed father from an alleged father.[2]

We conclude that insufficient evidence supports the court's determination at the section 366.26 hearing that ICWA did not apply to the dependency proceedings for A.J. Thus, we conditionally reverse the section 366.26 orders and remand the matter with directions to the juvenile court to ensure that CFS fully complies with the requirements and of ICWA and related California law.

## II. FACTS AND PROCEDURE

On January 31, 2022, CFS received a report alleging that Mother was living "out on the streets," using methamphetamine, and neglecting to care for A.J., then age nine months. The report alleged that, from late October 2021 to January 19, 2022, Mother was sober and living in North Dakota with A.J. But Mother relapsed and began using methamphetamine again after Mother returned to California with A.J. around January 19. Mother had a history of leaving A.J. "with random people" so she could "go off and use drugs." A.J.'s alleged father, P.J., was incarcerated at North Kern State Prison and was expected to be released in April 2022. The reporting party did not know where Mother and A.J. were staying but said it was unlikely they were staying with the MGM and an

_____

[2] The parents join each other's contentions in this appeal. (Cal. Rules of Court, rule 8.200(a)(5).) Further references to rules are to the California Rules of Court.

3

unidentified maternal aunt, where they had previously stayed, because those maternal relatives were upset with Mother and did not want Mother in their homes.

CFS received two earlier referrals on August 29, 2021 and October 14, 2021, alleging Mother was neglecting A.J. due to "substance abuse, as well as gang affiliation and weapons in the home in the presence of the child." These referrals were closed as inconclusive because Mother and A.J. were unable to be located. Mother had an extensive CFS history, dating to 2002 and involving eight other children. A.J. is Mother's ninth child. Before the January 31, 2022 referral involving A.J., Mother failed to reunify with her eight older children despite being offered or provided with reunification services, and Mother's parental rights to some of her eight older children had been terminated.

After receiving the January 31, 2022 referral, CFS contacted Mother, and Mother gave CFS an address where she could be contacted for "face-to-face" interviews. On February 7, two social workers made an unannounced visit to the address Mother provided. There, the maternal aunt, Lupé S., said that Mother and A.J. did not live there, Lupé S. had last seen Mother and A.J. on February 6, and Mother was scheduled to begin a treatment program on February 8. Lupé S. called Mother, Mother gave the social workers another address, and Mother said she would be at that address in 20 minutes. When the social workers arrived at the second address, Mother was not present and, when contacted by phone, said she was at Walmart. CFS next discovered that Mother had not called her treatment program to confirm that she would check in as scheduled on February 9. Later on February 8, CFS obtained a detention warrant, took A.J. into its

4

temporary protective custody, and placed A.J. in temporary foster care with A.J.'s older sibling, M.

On February 10, 2022, CFS filed a petition alleging juvenile court jurisdiction over A.J. pursuant to section 300, subdivisions (b), (g), and (j). The petition alleged that: Mother and the alleged father, P.J., had substance abuse histories and extensive criminal histories; the parents knew or should have known about each other's substance abuse and criminal histories; Mother had an unstable lifestyle, a history of homelessness, and was unable to provide A.J. with adequate shelter and care; Mother's reunification services and parental rights to "multiple children" had been terminated; P.J. had been incarcerated several times and continued to be arrested and incarcerated; P.J.'s whereabouts and willingness and ability to parent and provide for A.J. were unknown; P.J. had not made "any efforts" to provide for A.J.; and P.J.'s parental rights to one of A.J.'s older siblings had been terminated.

A February 14, 2022 detention report stated that ICWA did not apply. The report included a chart indicating that, on January 27 and 28, 2020, unspecified "inquiry" was made of Mother, P.J., and a maternal cousin, Savannah H., and none of them reported Native American ancestry. The report indicated that the inquiries were made after Mother's eighth child, M., was born in January 2020 and was placed with maternal cousin, Savannah H. The report included a telephone number for Savannah H. The report thus indicated that P.J. is M.'s biological father and stated that several children, including M., had been removed from P.J.'s care. In describing Mother's prior dependency cases, the detention and jurisdiction and disposition reports indicated that, in

5

addition to Lupé S., Mother had three other sisters or maternal aunts to A.J.: Sylvia C., Teresa R., and Reyna C.

In response to the juvenile court's questions at the February 14, 2022 detention hearing, Mother said she had no Native American ancestry and identified P.J. as A.J.'s biological father. Mother said she was certain that P.J. signed A.J.'s birth certificate or "paperwork" when A.J. was born at a hospital, but Mother and P.J. were not married and P.J. had never lived with A.J. P.J. was not present at the February 14 detention hearing, and Mother said she believed he was incarcerated "somewhere in Orange County." The court ordered A.J. detained.

Also on February 14, 2022, Mother completed (1) a family find and ICWA inquiry form (CFS 030), and (2) a parental notification of Indian status form (ICWA-020). On the family find form, Mother identified two cousins, Teresa R. and Monica R., as her first and second choices for A.J.'s placement. As additional family contact information, Mother listed the MGM and an "aunt" Teresa and a phone number for each of them. On the notification form, Mother checked the box "none of the above apply," indicating that neither A.J., Mother, nor any of A.J.'s maternal lineal ancestors were members of, or eligible for membership in, a federally recognized Indian tribe. In the jurisdiction and disposition report filed March 3, CFS noted that the juvenile court found ICWA did not apply in three prior jurisdiction and disposition hearings in 2014, 2015.

Mother was not in contact with CFS between February 14 and March 14, 2022. During a March 14 interview with CFS, Mother again reported having no Native American heritage. Mother said the MGM lived in San Bernardino, her father was

6

deceased, and she had two brothers and three sisters who were "good support" to her. Mother also claimed that P.J. was A.J.'s biological father; P.J. was present at the hospital when A.J. was born and is listed on A.J.'s birth certificate as A.J.'s father. On March 18, the juvenile court again found ICWA did not apply, sustained the allegations of the petition, declared A.J. a dependent, bypassed services for Mother (§ 361.5, subd. (b)(10), (b)(11)), and found that P.J. was an alleged father not entitled to services.

An ICWA "review hearing" was held on July 18. In response to the juvenile court's questions at the hearing, Mother said she was not an enrolled member of any tribe and had no "additional information on Indian ancestry." CFS filed a report for the July 18 hearing, documenting its attempts to contact A.J.'s family members to conduct ICWA-related inquiries. The report stated that, on June 14, 2022, CFS contacted the maternal aunt Teresa R. and the MGM at the phone number the Mother had provided for Teresa R., but CFS received a message stating the number was no longer in service. On June 14 and 15, CFS twice attempted to call the maternal cousin, Monica R. During the first call, the phone continued to ring, and there was no option to leave a message; during the second call, the phone rang several times and disconnected. On June 15, CFS contacted the Mother's niece, Savannah H., who was identified in the detention report as a maternal cousin. Savannah H. said she did not know of any Indian heritage in the family. On June 15, CFS attempted to contact P.J. at his last known phone number, but the number was disconnected. The report for the July 18 ICWA review hearing did not mention whether CFS had attempted to contact (1) the MGM, at the number Mother provided *for the MGM* on the family find form on February 14, or (2) the maternal aunt,

7

Lupé S., whom social workers contacted on February 7, to ask the MGM and Lupé S. whether A.J. may be an Indian child. At the July 18 hearing, the juvenile court found that CFS had completed the ICWA inquiry and ICWA did not apply.

On August 15, 2022, CFS filed a report stating that, on July 15, P.J. left a message with CFS, saying P.J. wanted to speak with the social worker about the case and that he wanted to be present in juvenile court on July 18, but he was incarcerated at West Valley Detention Center. P.J.'s July 15 message also asked the social worker to contact P.J.'s mother at a specific phone number. On July 19, the social worker called the number for P.J.'s mother, Melissa J., and left a voice message requesting a return call. On July 27, the social worker twice called the number for Melissa J., and both times the phone continued to ring without the option of leaving a message.

Throughout the proceedings, A.J. remained in foster care with her older sibling, M. At the time of the section 366.26 hearing on August 30, 2022, the foster parents were in the process of adopting M. and were willing to adopt A.J. At the section 366.26 hearing, the parties stipulated that, if the social worker were to testify, her testimony would be that she called the number for the MGM provided by Mother on the family find form and discovered that the number was not associated with the MGM or with anyone connected to Mother's family. Following that submission, the juvenile court found that CFS had satisfied its duty of inquiry and that ICWA did not apply.

P.J. first appeared in the proceedings at the section 366. 26 hearing. P.J.'s counsel, who was appointed on July 26, 2022, argued that P.J. should be considered A.J.'s presumed father and granted reunification services. Minor's counsel argued it

8

would be "massively procedurally improper" to grant P.J.'s request for services because the petition was filed in February and P.J. had had several months "to come forward and elevate his status" to presumed father, but he had not done so. County counsel noted that CFS had attempted to contact P.J. and serve P.J. with notice of the proceedings at "multiple addresses and phone numbers," but P.J. did not come forward, "even when he was out of custody." The juvenile court acknowledged CFS's due diligence in attempting to contact P.J. and agreed it was too late for P.J. to elevate his status to a presumed father. The juvenile court terminated parental rights to A.J. and selected adoption as A.J.'s permanent plan. The parents appeal from the August 30 section 366.26 orders.

## III. DISCUSSION

### A. *Legal Principles*

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) ICWA establishes minimum standards that state courts must follow before removing an Indian child from the child's family and placing the child in foster care or an adoptive home. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.) An " 'Indian child' " is any unmarried person under the age of 18 who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C.

§ 1903(4), (8); § 224.1, subd. (b) [adopting federal definition of Indian Child for ICWA-related state law].)

Federal regulations implementing ICWA require state courts to "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. (25 C.F.R. § 23.107(a) (2022).) This inquiry is to be made "at the commencement" of the proceeding, and "all responses should be on the record." (*Ibid.*) State courts are also required to "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (*Ibid.*)

California law mirrors these federal requirements and imposes additional duties on juvenile courts and child welfare agencies to inquire whether a child for whom a section 300 petition "may be or has been filed, is or may be an Indian child." (§ 224.2, subds. (a)-(c); rule 5.481(a)(2)-(a)(5); 25 U.S.C. § 1921 [state law may provide "a higher standard of protection to the rights of the parent or Indian custodian of an Indian child"]; see *In re Abigail A.* (2016) 1 Cal.5th 83, 93.) At the first appearance in court of each party in a dependency proceeding, the court is to (1) "ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child,"( 2) "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child," *and* (3) "[o]rder the parent . . . to complete *Parental Notification of Indian Status* (form ICWA-020)." (§ 224.2, subd. (c); rule 5.481(a)(2)(A)-(C).)

The juvenile court and child welfare agency have "an affirmative and continuing duty to inquire" whether a child for whom a section 300 petition "may be or has been filed, is or may be an Indian child." (§224.2, subd. (a); see *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 9; rule 5.481(a).) "The duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry." (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 678.) "The duty to inquire begins with the initial contact" and includes, but is not limited to, "asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).)

If the child is taken into the temporary custody of the child welfare agency (§§ 224.2, subd. (b), 306), the initial duty of inquiry requires the agency to "as[k] the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled" (§ 224.2, subd. (b); *In re Austin J.* (2020) 47 Cal.App.5th 870, 883). " 'Extended family member[s]' " are "defined by the law or custom of the Indian child's tribe" and, in the absence of such law or custom, consist of adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. §1903(2); § 224.1, subd. (c).)

The duty of further inquiry arises if there is a "reason to believe that the child is an Indian child." (§ 224.2, subd. (e).) There is reason to believe a child is an Indian child if the court or child welfare agency has "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe."

11

(§ 224.2, subd. (e)(1).)  The required further inquiry includes interviewing the parents

and extended family members to gather the information to be included in ICWA notices,

contacting the Bureau of Indian Affairs and State Department of Social Services to gather

the names and contact information of any identified tribes, and contacting the tribes and

any other person who may reasonably be expected to have information regarding the

child's membership status or eligibility for membership in an Indian tribe.  (§ 224.2,

subd. (e)(2); *In re T.G.* (2020) 58 Cal.App.5th 275, 294.)

Notice of the proceedings is required to be given if there is "reason to know" the

child is an Indian child.  (25 U.S.C. § 1912(a); §§ 224.3, subd. (a), 224.2, subd. (d); *In re

Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884.)  "Notice to Indian tribes is central to

effectuating ICWA's purpose, enabling a tribe to determine whether the child involved in

a dependency proceeding is an Indian child and, if so, whether to intervene in, or exercise

jurisdiction over, the matter."  (*In re T.G.*, *supra*, 58 Cal.App.5th at p. 288.)  The question

of membership is determined by the tribes, given that ICWA defines " 'Indian child' in

terms of tribal membership, not race or ancestry."  (*In re K.T.* (2022) 76 Cal.App.5th 732,

742.)

A juvenile court's finding that ICWA does not apply includes an implicit finding

that the child welfare agency fulfilled its duty of inquiry.  (*In re Austin J.*, *supra*,

47 Cal.App.5th at p. 885.)  On appeal, ICWA findings and orders are reviewed for

substantial evidence.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051; § 224.2, subd.

(i)(2).)  We must uphold the findings and orders if any substantial evidence supports

them, and we resolve all conflicts in the evidence in favor of affirmance.  (*In re A.M.*

(2020) 47 Cal.App.5th 303, 314.) When, however, the facts are undisputed, we independently determine whether the requirements of ICWA and related California law (§§ 224-224.6) have been satisfied (*In re Michael V.* (2016) 3 Cal.App.5th 225, 235, fn. 5). As the appellants, Mother and P.J. have the burden to show that insufficient evidence supports the juvenile court's ICWA-related findings and orders. (*Austin J.*, at p. 885.)

B. *The Initial Duty to Inquire/The Reporting Party and Maternal Relatives*

The parents first claim that CFS did not discharge its duty of initial inquiry under state law (§ 224.2, subd. (b)) because it did not make a meaningful effort to locate and interview six maternal family members concerning A.J.'s possible status as an Indian child: the MGM, the maternal cousin Monica R., and maternal aunts Lupé S., Teresa R., Sylvia C., and Reyna C. We agree. The inquiry errors also extend to the party who reported that Mother was neglecting A.J. and to all of the maternal relatives who were available to CFS, namely, Mother, Lupé S. and Savannah H.

"[A] social services agency has the obligation *to make a meaningful effort* to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709, italics added.) The agency also has an obligation to make an adequate record showing that the agency undertook a meaningful effort—that is, a reasonably sufficient effort under the circumstances—to locate and interview extended family members concerning the possible Indian child status of the child. (*In re K.R.*, at pp. 708-709; *In re N.G.* (2018) 27 Cal.App.5th 474, 482-485; see rule 5.481(a)(5).) The object of the initial

13

inquiry is to determine whether there is reason to believe the child is an Indian child, warranting further inquiry to determine whether there is reason to know the child is an Indian child, which in turn requires notice of the proceedings to be given. (§ 224.2, subds. (b), (e).)

The Courts of Appeal are split on the standard for determining whether state law ICWA-related inquiry error (§ 224.2) is prejudicial, and our Supreme Court is reviewing the question. (*In re Dezi C.* (2022) 79 Cal.App.5th 769 [review granted Sept. 21, 2022, S275578].) Pending a contrary decision by our Supreme Court, we will apply the standard for determining prejudicial inquiry error recently adopted by this court in *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744-745.) Under the *Benjamin M.* standard, initial inquiry error is prejudicial if the agency failed to interview available individuals who had information likely to bear meaningfully on the determination of whether the child is an Indian child, regardless of what the missing information may have shown. (*Benjamin M.*, at pp. 744-745; *In re Ricky R.*, *supra*, 82 Cal.App.5th at pp. 676-677; *In re D.B.* (2022)___Cal.App.5th___(Dec. 6, 2022, E079380) [2022 Cal.App.Lexis 1075, at pp. *6-*10].)

"Under *Benjamin M.*'*s* prejudice analysis, we do not speculate about whether the extended family members might have information that suggests the child is an Indian child. [Citation.] We instead ask whether 'the information in the possession of extended relatives is likely to be meaningful in determining whether the child is an Indian child— regardless of whether the information ultimately shows the child is or is not an Indian child.' " (*In re D.B.*, *supra*,___Cal.App.5th___[2022 Cal.App.Lexis 1075 at p. *9,

14

quoting *In re Antonio R.* (2022) 76 Cal.App.5th 421, 435]; *In re J.C.* (2022) 77 Cal.App.5th 70, 82.)

The record does not show that CFS made a meaningful or reasonable effort to locate and contact the MGM, Teresa R., Sylvia C., or Reyna C., to ask these maternal extended family members for information relevant to A.J.'s possible status as an Indian child. First, the record does not show that CFS asked the party who reported on January 31, 2022 that Mother was neglecting A.J. whether the party had any information bearing on A.J.'s status as an Indian child. (§ 224.2, subd. (a) ["The duty to inquire begins with the initial contact" and includes "asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child."].) The party may have been able to give CFS an address and contact information, including a working phone number, for the MGM and the unspecified maternal aunt whom the reporting party mentioned when speaking with CFS on January 31, 2022. But the record does not show that CFS asked the party for any ICWA-related information or for contact information for any of A.J.'s maternal relatives, even though the reporting party indicated they may have had such information.

The record also does not show that CFS ever asked the maternal aunt, Lupé S., for information bearing on whether A.J. was an Indian child, even though Lupé S. was available to CFS on February 7, 2022, shortly before CFS took A.J. into protective custody on February 8 pursuant to a detention warrant. On February 7, CFS spoke in-person with Lupé S. at the address where Mother told CFS that Mother could be contacted for an in-person interview. But the record does not indicate that CFS asked

15

Lupé S. for information concerning A.J.'s possible Indian child status (§ 224.2, subd. (b)), either when CFS first contacted Lupé S. on February 7 or later, including in preparation for the July 18 ICWA review hearing—even though Lupé S. had information likely to bear meaningfully on whether A.J. was an Indian child—regardless of what the information would have shown, and even though Mother and Savannah H. had denied knowing of any tribal membership or Indian ancestry in the maternal family. (See *In re D.B.*, *supra*,___Cal.App.5th___[2022 Cal.App.Lexis 1075 at pp. *8-*10]; *In re Ricky R.*, *supra*, 82 Cal.App.5th at pp. 676-677; *In re Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 744-745.) It is also likely that Lupé S. had addresses and other contact information for the MGM, Monica R., Teresa R., Sylvia C., and Reyna C. But the record does not show that CFS ever asked Lupé S. for any contact information for any maternal extended family members.

Further, the record does not show that CFS ever asked Savannah H. (who, like Mother and Lupé S., was in contact with the CFS) for any contact information for the known maternal relatives. On February 14, 2022, Mother provided a phone number for the MGM, which turned out not to be associated with the MGM or anyone else in the family. On March 14, Mother reported that the MGM lived in San Bernardino. But the record does not show that CFS ever asked Mother or the other available maternal relatives (Lupé S. and Savannah H.) for the MGM's address, or that CFS attempted to find the MGM's address through the internet or social media. Nor did CFS ask Mother, Lupé S., or Savannah H. for an alternative phone number for the MGM after CFS discovered that the telephone number Mother gave for the MGM was a wrong number.

16

The parents argue that the duty of initial inquiry (§ 224.2, subd. (b)) required CFS to try to locate and interview the MGM, Monica R., and Teresa R., either by mail, social media, or in person after CFS unsuccessfully attempted to contact these individuals by phone on June 14-15, 2022. To the extent the parents suggest an agency must "make every reasonable effort" and "leave no stone unturned" in attempting to locate and interview extended family members for ICWA-related information, we disagree. An agency is required to make every reasonable effort to notify parents of dependency hearings. (See *In re Mia M.* (2022) 75 Cal.App.5th 792, 808-809.) But no law requires an agency to make every reasonable effort to locate and interview extended family members for ICWA-related information. (See § 224.2.)

Rather, the agency is only required to make a "meaningful effort" to locate and interview extended family members for ICWA-related information. (*In re K.R.*, *supra*, 20 Cal.App.5th at pp. 707-708.) And here, the record does not show that CFS made a meaningful effort to locate and interview the MGM, Teresa R., Monica R., Sylvia C., and Reyna C. concerning A.J.s' possible Indian child status, even though these individuals had information that was likely to bear meaningfully on whether A.J. was an Indian child. (*In re Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 744-745; § 224.2, subd. (b).) The record also does not show what ICWA-related inquiries were made in the prior dependency proceedings involving Mother's older children. Thus, the prior juvenile court findings in the prior proceedings that ICWA did not apply were not useful to the juvenile court in determining whether ICWA applied to the current proceedings for A.J.

17

CFS argues it was not required " ' " 'to cast about' " for investigative leads' " in order to satisfy its initial duty of inquiry. (*In re G.H.* (2022) 84 Cal.App.5th 15, 30.) Indeed, CFS was not required to pursue unidentified or deceased relatives for ICWA-related information. (See *ibid*.) But CFS was required to make a reasonable effort to locate and interview *known* maternal extended family members by asking available maternal family members and the reporting party for additional contact information for the known maternal relatives who were not in contact with CFS, in order to obtain information relevant to whether A.J. was an Indian child. (See *In re Oscar H.*(2022) 84 Cal.App.5th 933, 937; § 224.2, subds. (a), (b).) The record does not show that these inquiries were made. Thus, the initial inquiry errors are prejudicial and require reversal. (See *In re H.V.* (2022) 75 Cal.App.5th 433, 438; *In re N.G.*, *supra*, 27 Cal.App.5th at pp. 484-485.)

C. *The Duty to Inquire of the Alleged Father*, P.J.

The parents claim the juvenile court and CFS erroneously failed to ask P.J. whether A.J. may be an Indian child when P.J. first appeared in the proceedings at the section 366.26 hearing on August 30, 2022, several months after the proceedings commenced in February 2022. (§ 224.2, subd. (c); rule 5.481(a)(2)-(3).) CFS argues that P.J. failed to establish a biological connection to A.J.; therefore, P.J. was not a " 'parent' " within the meaning of ICWA or related California law.

ICWA does not apply to an unwed, alleged father who has failed to establish his paternity. (*In re Daniel M.* (2003) 110 Cal.App.4th 703, 708; 25 U.S.C. §1903(9) [" 'parent' " includes "any biological parent" of an Indian child or "any Indian person

who has lawfully adopted an Indian child," but does not include an "unwed father where paternity has not been acknowledged or established"]; see *In re S.H.* (2022) 82 Cal.App.5th 166, 171.) But here, uncontroverted evidence shows that P.J. established his biological paternity of A.J. by signing A.J.'s birth certificate. Mother identified P.J. as A.J.'s biological father and said she was sure P.J. signed A.J.'s birth certificate at the hospital when A.J. was born. The record also shows that P.J.'s older sibling, M., is P.J.'s full sibling through Mother and P.J. Thus, the juvenile court and CFS erred in failing to make the required ICWA-related inquires of P.J. when P.J. first appeared in the proceedings at the section 366.26 hearing. (§ 224.2. subd. (c); rule 5.481(a)(2)-(3).)

## IV.  DISPOSITION

The August 30, 2022 orders terminating parental rights and selecting adoption as A.J.'s permanent plan are conditionally reversed.  The matter is remanded to the juvenile court with directions to comply with, and to ensure that CFS complies with, the inquiry provisions of ICWA and of sections 224.2 and 224.23 of the Welfare and Institutions Code.  If, after completing the initial inquiry, neither CFS nor the juvenile court have reason to believe A.J. is an Indian child, the section 366.26 orders shall be reinstated.  If, however, through the initial inquiry, CFS and the juvenile court discover a reason to believe or a reason to know that A.J. is an Indian child, CFS and the juvenile court shall proceed as required under ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:


MILLER _____
Acting P.J.

20

[*In re A.J.; CFS v. J.C. et al.*, E079687]

MENETREZ, J., Concurring.

In my view, the expanded duty of initial inquiry under subdivision (b) of Welfare and Institutions Code section 224.2 applies only if the child was taken into temporary custody without a warrant pursuant to Welfare and Institutions Code section 306. (See *In re Adrian L.* (2022) 86 Cal.App.5th 342, 355-359 (conc. opn. of Kelley, J.).) No opinion of this court has ever addressed that issue, so we have no contrary precedent. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160 ["'it is axiomatic that cases are not authority for propositions not considered'"]; *Fairbanks v. Superior Court* (2009) 46 Cal.4th 56, 64 ["a judicial decision is not authority for a point that was not actually raised and resolved"].) The child in this case was detained pursuant to a warrant, so the expanded duty of initial inquiry under subdivision (b) of Welfare and Institutions Code section 224.2 does not apply. But because appellants correctly argue that there was at least one violation of the inquiry requirements of subdivision (c) of Welfare and Institutions Code section 224.2, I concur in the judgment.

MENETREZ          
                                 J.

1